## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ANDREW R. JOHNSON,**

     Plaintiff,

vs.                               **CASE NO. 6:22-cv-01778**

**THE CITY OF KISSIMMEE, FLORIDA,**
a political subdivision of the State of Florida,

     Defendant.
_____/

### VERIFIED COMPLAINT FOR DAMAGES WITH REQUEST FOR EQUITABLE RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff, ANDREW R. JOHNSON, ("JOHNSON"), by and through his undersigned counsel, hereby sues Defendant, THE CITY OF KISSIMMEE, FLORIDA ("CITY"), and alleges the following:

### INTRODUCTION

1.    This is a five count complaint for: a violation of JOHNSON's rights under the First and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. §1983 (Count I); unlawful race discrimination, brought pursuant to 42 U.S.C. §1981 and 42 U.S.C. §1983 (Count II), race and sex/gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981a (collectively "Title VII") (Counts III and IV, respectively);  as well as a claim under the Fifth and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. §1983, due to the deprivation  of JOHNSON's public name and reputation as protected by the Fifth and Fourteenth Amendments to the United States Constitution (Count V); with

each count seeking damages in excess of $75,000, exclusive of interest and costs, plus equitable relief, attorney's fees and court costs.

## JURISDICTION, VENUE, AND PARTIES

2.      This court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§1331 and 1343.

3.      This Court is vested with jurisdiction to order an injunction, award front pay, back pay, order reinstatement, or provide any other equitable relief as may be proper, as well as awarding compensatory damages, attorney's fees and court costs, expenses, pre-judgment and post-judgment interest, and any other legal and/or equitable relief deemed appropriate by this Court.

4.      Venue is proper in this Court because the CITY maintains offices, does business, and is located within Kissimmee, Osceola County, Florida. In addition, venue is appropriate within this Federal District and Division because the injury was sustained, and the conduct and cause of action which gives rise to the instant suit occurred within Osceola County, Florida. Venue is therefore proper within this Court, pursuant to 28 U.S.C. §1391(b).

5.      Plaintiff JOHNSON is an adult White/Caucasian male and is a "person" entitled to bring such action, pursuant to 42 U.S.C. §§1981 and 1983.

6.      Plaintiff JOHNSON is also "person" and an "employee" entitled to bring such action, pursuant to 42 U.S.C. §2000e(a) and (f) of Title VII.

7.      At all times material hereto, JOHNSON served as an employee of the CITY, specifically, within the CITY's Police Department ("Department").

2

8.      Defendant CITY is a municipal subdivision of the State of Florida and, at all times material hereto, was the public employer of Plaintiff JOHNSON.

9.      Further, CITY was and is an "employer" and an entity subject to liability under 42 U.S.C. §§1981 and 1983, respectively.

10.     Defendant CITY is also an "employer" as defined by Title VII.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

11.     Plaintiff JOHNSON timely filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") on or about July 27, 2021, alleging discrimination based on Plaintiff's race (Caucasian) and sex/gender (male). A copy of the Charge is attached hereto as **Exhibit "A"**.

12.     Upon request, the U.S.  Department of Justice, Civil Rights Division, issued its Notice of Rights ("Right to Sue"), a copy of which is attached as **Exhibit "B"** hereto.

13.     Accordingly, JOHNSON has satisfied any and all administrative prerequisites and all conditions precedent prior to the filing of this action, pursuant to the EEOC.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

14.     JOHNSON began his employment with CITY, and specifically, the CITY's Police Department, on or about March 9, 2020.

15.     Prior to his hire by the CITY's Police Department, i.e., the Kissimmee Police Department ("KPD" or "Department"), JOHNSON had served in law enforcement for two years at the Indian River Shores Public Safety Department, where he was selected Officer of the Year and received multiple letters of commendation from his supervisors and previous chief.

16.     Before his employment with Indian River Shores, JOHNSON had served actively in the United States Army for seventeen (17) years where he served as a Military Police Officer and achieved the rank of Private First Class before his first honorable discharge. JOHNSON had a second honorable discharge at the rank of Specialist.

17.     In addition to being a disabled Iraq War veteran, JOHNSON still serves in the Army Reserves at the rank of Sergeant as an observer, controller and trailer ("OC/T"), while still enlisted as a Military Police Officer.

18.     JOHNSON has incurred no discipline at all during his military career.

19.     After his hire with the CITY, JOHNSON served as a Patrol Officer in a probationary status during his first year of employment.

20.     During his brief employment with the CITY (through the KPD), JOHNSON worked under the direction of Sergeants Charlie Popp and Moses Perez.

21.     Before the acts that gave rise to this lawsuit, JOHNSON satisfactorily performed his duties.

22.     During the first approximate ten (10) months of his career with the CITY, JOHNSON incurred no prior discipline.

23.     From approximately August 2020 until early January 2021, JOHNSON, who is of the Christian religion, pro-life, Republican, and pro-gun, posted his opinions on his private (personal) Facebook page as a private citizen on matters of public concern, including matters relating to political, social, or other community concerns, or a subject of legitimate news interest, based on content, form, and context of the speech.

4

24.     In sum, the postings were mostly "re-posts" of material created by others, but for which JOHNSON agreed based on his personal and/or political, religious, or social views in some instances.

25.     Allegedly a "concerned citizen" sent former Officer JOHNSON's personal social media posts to the KPD on January 12, 2021 from an email known as madisonbowman891@gmail.com with the subject line stating, "Officer Drew Johnson."

26.     The email's author wrote the Officer "is a very big problem…and is incapable of doing his job without bias which as we know is a massive problem for police in this country."

27.     As support of such statement,  the author of the email attached thirty (30) screen shot pictures of Facebook posts from the Facebook account identified as  "Drew Johnson" (the "Facebook Posts"). Copies of the Facebook Posts are attached hereto as **Exhibit "C"**.

28.     After Corporal Andrew Holmberg of KPD's Internal Affairs Unit responded to the person (madisonbowman891@gmail.com) that same day, January 12, 2021, to confirm receipt of the email, he also asked if the individual would be willing to speak to Corporal Holmberg.

29.     That same day, January 12, 2021, the individual responded to Corporal Holmberg and stated that they wished to remain anonymous.

30.     Without being questioned about the Facebook Posts, JOHNSON was abruptly relieved from duty on January 12, 2021, by Captain Christopher Succi of the KPD Patrol Division and placed on paid administrative leave.

31.     Two days later, on January 14, 2021, JOHNSON was terminated by the CITY's Chief of Police, Jeffrey O'Dell ("Chief O'Dell"), with an effective date of January 15, 2021

32.     The stated reason for JOHNSON's termination was allegedly solely because he was a "Probatonary Police Officer," **but with no other reason(s) provided**. A copy of the termination notice is attached as **Exhibit "D"** hereto.

33.     JOHNSON was terminated  without a thorough  investigation into the Facebook Posts, nor an opportunity to verbally respond to Chief O'Dell before being terminated.

34.     Despite no reason(s) for his termination being stated in the letter from Chief O'Dell, JOHNSON later learned through media reports that he was terminated because his Facebook Posts allegedly violated KPD policies.

35.     For example, on January 22, 2021, JOHNSON's termination went public to news sources nationwide following the publication of a news story by Katie Rice of the *Orlando Sentinel*.

36.     In the story by Ms. Rice, JOHNSON was labeled as a police officer fired for "his Facebook posts containing racially insensitive and politically charged content" which violated KPD's "department's professional standards and social media policy" by allegedly posting opinions that did not align with the Department's "core values." Ms. Rice's source for the information contained within her published news story came from Samantha Scarp, a public information officer with KPD.

37.     KPD's Social Media Policy contains a section entitled, "Personal Use Off Duty." This policy, which was implemented by Chief O'Dell on July 6, 2020, provided:

> **207.05 Personal Use Off Duty:** Agency members shall adhere to section 5.1 of the City Personnel Manual which states: "City employees are expected to demonstrate prompt, professional, courteous, respectful, fair, and honest treatment to all citizens and fellow employees" during all social media usage. Furthermore, Agency members shall adhere to section 6.2 of the City Personnel Manual, the City's Anti-Harassment Policy during all social media usage. Agency members

6

shall not post pictures of crime scenes, evidence, or discuss on going cases on social media. Nothing herein is meant to prohibit Section (7) activity as employees have a right to discuss their wages and other terms and conditions of employment.

38.  KPD's Social Media Policy, at the time of JOHNSON's termination, was unconstitutional and prevents permissible and constitutionally protected free speech.

39.  JOHNSON's Facebook Posts were made off duty.

40.  JOHNSON's Facebook Posts were made as a private citizen.

41.  JOHNSON's Facebook Posts were about matters of public concern, including social, political, religious or other community concerns, or a subject of legitimate news interest.

42.  JOHNSON's Facebook Posts were not made within the course and scope of JOHNSON's duties as an employee of CITY or KPD.

43.  JOHNSON's Facebook Posts were not made on behalf of the CITY or KPD.

44.  JOHNSON's Facebook Posts did not reference his employment with the CITY or display any insignia or affiliation with KPD.

45.  JOHNSON's Facebook Posts did not interfere with his ability to interact with his coworkers, citizens of Kissimmee, or otherwise interfere with his job duties as a KPD police officer.

46.  JOHNSON's Facebook Posts did contain his personal opinions and viewpoints on matters of public concern.

47.  JOHNSON's Facebook Posts were protected free speech.

48.     Whether KPD's Social Media Policy at the time of JOHNSON's termination was unconstitutional or not, JOHNSON's Facebook Posts did not violate the "Personal Off Duty Use" of KPD's Social Media Policy.

49.     JOHNSON's Facebook Posts were not unprofessional towards citizens of Kissimmee.

50.     JOHNSON's Facebook Posts were not unprofessional toward fellow employees of the CITY or KPD.

51.     JOHNSON's Facebook Posts were not discourteous towards citizens of Kissimmee.

52.     JOHNSON's Facebook Posts were not discourteous towards fellow employees of the CITY or KPD.

53.     JOHNSON's Facebook Posts were not disrespectful towards citizens of Kissimmee.

54.     JOHNSON's Facebook Posts were not disrespectful towards fellow employees of the CITY or KPD.

55.     JOHNSON's Facebook Posts were not unfair treatment towards citizens of Kissimmee.

56.     JOHNSON's Facebook Posts were not unfair treatment towards fellow employees of the CITY or KPD.

57.     JOHNSON's Facebook Posts were not dishonest treatment towards citizens of Kissimmee.

58.     JOHNSON's Facebook Posts were not dishonest in their treatment towards fellow employees of the CITY or KPD.

59.     JOHNSON's Facebook Posts did not violate the City's Anti-Harassment Policy.

60.     JOHNSON's Facebook Posts did not contain pictures of crime scenes, evidence, or discussion of ongoing cases of the KPD.

61.     Notably, the KPD amended its social media policy regarding the personal use when off duty, but only *after* JOHNSON was terminated, with the following language added:

> **207.05 Personal Use Off Duty:** Agency members shall adhere to the following when using social media:
>
> a. Agency members are free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of this agency, impede the performance of duties, impair discipline and harmony among coworkers, or negatively affect the public perception of the agency.
>
> b. As public employees, agency members are cautioned that speech on or off-duty, made pursuant to their official duties and responsibilities is not protected speech under the First Amendment and may form the basis for discipline if deemed detrimental to the agency.
>
> c. Agency members shall not post, transmit, or otherwise disseminate any information to which they have access because of their employment without written permission from the Chief or their designee.
>
> d. For safety and security reasons, agency members are cautioned to avoid the following:
>
>> 1. Displaying agency logos, uniforms, or similar identifying information on personal social media pages, and
>> 2. Posting personal photographs or providing similar means of personal recognition that may cause them to be identified as a member of this agency. Officers who are, or who may reasonably be expected to work in undercover operations, shall not post any form of visual or personal identification.

e. When using social media, agency personnel should be mindful that their speech becomes part of the worldwide electronic domain. Therefore, adherence to the agency's standards of conduct is required in the personal use of social media. In particular, agency members are prohibited from the following:

    1. Making, sharing, or commenting in support of any posting that includes harassment, threats of violence, or similar conduct,

    2. Making, sharing, or commenting in support of any posting that ridicules, maligns, disparages, or expresses bias or disrespect toward any race, religion, sex, gender, gender identity, sexual orientation, nationality, or any other protected class of individuals,

    3. Making, sharing, or commenting in support of any posting that suggests that agency members are engaged in behavior reasonably considered to be unlawful or reckless toward public safety, and

    4. Otherwise violating any law, City policy, or Standard for Police Department Conduct.

f. Engaging in prohibited speech noted herein, may provide grounds for undermining or impeaching an agency member's testimony in civil or criminal proceedings.

g. Agency members may not make any statements, speeches, appearances, endorsements, or publish materials that could reasonably be considered to represent views or positions of this agency without written permission from the Chief or their designee.

h. Agency members should be aware that they may be subject to civil litigation for:

    1. Publishing or posting false information that harms the reputation of another person, group, or organization,

    2. Publishing or posting private facts and personal information about someone without their permission that has not been previously revealed to the public, is not of legitimate public concern, and that would be offensive to a reasonable person,

    3. Using someone else's name, likeness, or other personal attributes without that person's permission for an exploitative purpose, or

    4. Publishing the creative work of another, trademarks, or certain confidential business information without the permission of the owner.

i. Agency members should be aware that privacy settings for social media sites are constantly in flux, and they should never assume that personal information posted on such sites is protected.

j. Agency members should expect that any information created, transmitted, downloaded, exchanged, or discussed in a public online forum may be accessed by the agency at any time without prior notice.

k. Any agency member becoming aware of or having knowledge of a posting or of any social media page in violation of this policy is encouraged to notify their supervisor immediately for follow-up action.

l. Nothing herein is meant to prohibit Section (7) activity as employees have a right to discuss their wages and other terms and conditions of employment." \[1]

62.     In addition to being terminated for engaging in free speech, JOHNSON was unfairly terminated as compared to other police officers outside his protected classes who engaged in similar conduct with respect to social media as him.

63.     For instance, in contrast to JOHNSON being terminated, JOHNSON's black/African-American male peers, Officers Antonio Johnson ("Officer Antonio Johnson"), and Dickson Akadinma ("Officer Akadinma"), as well as a Hispanic peer, Officer Steven Somarriba ("Officer Somarriba"), were treated more favorably than JOHNSON, and certainly not terminated, for their social media postings.

64.     Specifically, Officer Antonio Johnson was the subject of an Internal Affairs investigation  (IA 19-003, dated March 6, 2019) for violation of KPD General Order (G.O.) 201.01(a) Standards of Conduct (one of the very same policies allegedly violated by JOHNSON), which states: "Employees shall not engage in any conduct which constitutes neglect of duty, conduct unbecoming an officer or City employee, or any act which is likely to adversely affect the discipline, good order, or reputation of the Department."

---

[1] Interestingly, while a Captain with the Orlando Police Department (OPD), then Captain O'Dell received discipline following an Internal Affairs investigation in 2006 which revealed that he and 4 fellow OPD officers  allegedly sent pornographic e-mails to each other while on duty (i.e., conduct unbecoming).

65.     Unlike JOHNSON however, Officer Antonio Johnson was permitted the opportunity to participate in his internal investigation and provide his side of the story, while JOHNSON was abruptly terminated and not afforded any semblance of procedural due process.

66.     Moreover, Officer Antonio Johnson was merely reprimanded for his violation and received an 8 hour suspension.

67.     Notably, upon information and belief, Officer Antonio Johnson's personnel file reveals after reviewing his disciplinary history for previous violations of G.O. 201, that the violations were resolved with discipline ranging from a written censure to an 8 hour suspension.

68.     Another black/African-American male comparator hired shortly before JOHNSON, Officer Dickson Akadinma ("Officer Akadinma"), was also the subject of an Internal Affairs investigation  (IA 20-006, dated October 1, 2020), for an alleged violation of G.O. 201 (one of the very same policies allegedly violated by JOHNSON),

69.     Again, unlike JOHNSON,  Officer Akadinma was permitted the opportunity to participate in the internal investigation and defend himself.

70.     Significantly, like JOHNSON, Officer Akadinma was still on probation.

71.     Yet, Officer Akadinma received more favorable treatment than JOHNSON as Officer Akadinma was issued only an oral reprimand for his sustained violation.

72.     Additionally, Officer Somarriba, in approximately in the summer of 2020, allegedly had social media postings regarding the racial protests in several cities across America.

73.     There was no investigation conducted (as was the case for JOHNSON), but merely a closed-door conversation at which time Officer Somarriba was disciplined informally.

74.     In short, Officers Antonio Johnson, Akadinma, and Somarriba were not terminated and remain employed.

75.     In addition, and upon information and belief, two female KPD officers also violated the KPD's social media policy with impunity.\²

76.     Specifically, Sergeant Shannon Taylor allegedly posted on social media photos while in uniform and with a weapon.

77.     Further, Hispanic female peer Officer Astrid Cruz allegedly posed in inappropriate attire and posted some photo(s) of same on social media.

78.     Upon information and belief, no internal affairs investigations were conducted and only minor discipline and/or a transfer was imposed internally for the two female officers. Again, however, unlike JOHNSON, neither Sergeant Taylor nor Officer Cruz was terminated.

79.     In addition, on or about March 1, 2022, an anonymous complaint was filed with the CITY and/or KPD in reference to similar social media violations for which JOHNSON was accused, by an individual identified as "Madison Bowman".

---

² After JOHNSON's termination in early 2021, and although not a sworn law enforcement officer, a civilian female KPD employee, Kelly Block, was terminated after posting something deemed not in keeping with KPD's core values on her personal social media account on Facebook.  Specifically, in April 2022, Kelly Block, a civilian employed by KPD was reported for posting, "Nothing more spectacular than what monkeys can do except for the attention grabbing ops." This was a comment in reference to a posting headlining "Rihanna wows in skimpy sequined bikini as she hugs A$AP Rocky just hours before his arrest." Kelly had listed the Kissimmee Police Department within her personal Facebook page and then was afforded more rights as a civilian then JOHNSON.  In fact, she was afforded the opportunity to explain her intent/purpose and it was stated by Chief O'Dell, "No final decision will be made until we have had this opportunity to meet." However, JOHNSON was not afforded the same opportunity to meet with Chief O'Dell.

80.     Fifteen (15) Officers of the KPD were reported for similar conduct as JOHNSON such as allegedly inappropriate social media postings supporting groups such as Black Lives Matter ("BLM"), or discussing former President Trump, Covid, and other controversial issues.

81.     The identified officers who were disciplined less severely than JOHNSON were:

(a) Jacob Lee
(b) Duane Fay
(c) Albert Aponte
(d) Astrid Cruz
(e) Lenora Wooten \[3]
(f) George Montgomery
(g) Cole Ryan
(h) Greasey Garrett
(i) Javier Brandon Salgado
(j) Joshua Acevedo
(k) Joshua Ortiz
(l) Karen Devalier
(m) Keith Clark
(n) Miguel Rivera
(o) Scott Bowman

82.     Upon information and belief, no internal investigation was conducted despite prior Social Media policy violations allegedly engaged in by George Montgomery, nor the terrorist organization support by Lenora Wooten, or for the other violations by the other officers listed above.

83.     In fact, rather than conducting investigations into these anonymous allegations of inappropriate social media postings as was done against JOHNSON,  a blanket text message was

---

[3] Officer Lenora Wooten posted a post supporting the Black Lives Matter movement as well as The Black Panther Party ("BPP"), a Marxist-Leninist and black power political organization that advocates the use of violence and guerilla tactics to overthrow the United States government. The BPP group is also classified as a "black extremist organization" by the Federal Bureau of Investigation ("FBI").
Source: https://vault.fbi.gov/Black%20Panther%20Party%20

sent out to the entire KPD (to "Police All") from Deputy Chief Daniel Schad, stating the following:

> "The department has recently received an anonymous email claiming several employees have violated the department's social media policy. I wanted to take a few moments to go over some information with everyone about social media. The section of the general order that gives guidance for employees for personal use off duty is GO 207.05. It is recommended each employee takes the time to go over the section periodically to make sure their posts, items posted to your site from others, etc. follow the department's guidelines. It is also recommended that each employee periodically looks at their settings and followers.
>
> If anyone has any questions, feel free to contact me directly. Take care and be safe."

84.     Additionally, the KPD has exhibited racial bias against its white/Caucasian officers by placing black officers on foot patrol to march with the BLM protesters on June 1, 2020, while placing white officers outside of the protest areas.

85.     The issue was later addressed by calling all of the black officers into the office with the upper administration of the KPD where they were issued an apology, and nothing further came of the matter.

86.     In addition, some KPD officers were observed taking a knee (i.e., engaging in political and/or racial speech) during the protest march and demonstrations and exhibiting policy violations, but no repercussions occurred.

87.     In short, JOHNSON was subjected to discrimination by virtue of disparate treatment based on his race and sex/gender, and political views, as compared to his aforementioned peers.

88.     KPD submitted an Affidavit of Separation to the Florida Department of Law Enforcement that also asserted that JOHNSON was terminated for "Unfavorable-Misconduct,"

15

and specifically, "Terminated for violation of agency or training school policy not involving a moral character violation defined in Rule 11B-27.0011, F.A.C." (See **Exhibit "E"** hereto).

89.     As a result, and as a direct and proximate cause, of his termination and the false and stigmatizing information made a part of the public record surrounding his termination (e.g., the Affidavit of Separation), JOHNSON has been unable to find employment within law enforcement and faces a severe hardship in resuming his career.

90.     The KPD also placed JOHNSON on the "Brady List," tarnishing him further. \[4]

91.     Despite his probationary status, JOHNSON's termination was contrary to the very policies adopted by the KPD and the CITY in terms of its non-discrimination and progressive discipline policies.

92.     Based upon the foregoing, JOHNSON was discriminated against based upon his race and sex/gender, and political views by the CITY through Chief O'Dell.

93.     At all times material hereto, the CITY, through its authorized agents and employees, including Chief O'Dell, were and are aware of the discrimination JOHNSON suffered, and/or condoned it.

94.     At all times material hereto, the CITY, and its authorized agents and employees, including Chief O'Dell, were aware that free speech, particularly while off duty, is protected by the First and Fourteenth Amendments to the United States Constitution; that is, that such rights were clearly established.

---

[4] A "Brady" or Giglio  list is a list compiled most often by a prosecutor's office or a police department containing the names and details of law enforcement officers who have had sustained incidents of untruthfulness, criminal convictions, candor issues, or some other type of issue placing their credibility into question.

95.    At all times material hereto, the CITY, and its authorized agents and employees, including Chief O'Dell, were aware that race and sex/gender discrimination  is prohibited under 42 U.S.C. §1981 and 42 U.S.C. §2000e, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981a (collectively "Title VII").

96.    The CITY, through its authorized agents and employees, including Chief O'Dell engaged in conduct, including falsely accusing JOHNSON of conduct unbecoming (off duty), and for violating KPD's "social media policy" by allegedly posting opinions that did not align with the Department's "core values;" by violating JOHNSON's First Amendment right to freely express his personal opinions or those within which he concurs, while off duty and on his personal social media page; and, ultimately, by terminating JOHNSON's employment, in willful disregard of his First Amendment and civil rights by treating him differently than his minority and female peers.

97.    Based on the foregoing, the CITY, through its authorized agents and employees, including Chief O'Dell, violated clearly established law and acted with malicious intent.

98.    Such conduct continued even after his termination by the CITY (KPD) when, upon information and belief, Chief O'Dell had a conversation with Major Dan Weis of the Osceola County Sheriff's Office when Major Weis contacted Chief O'Dell about possibly hiring JOHNSON. Major Weis declined to hire JOHNSON after his conversation with Chief O'Dell.

99.    No legitimate business reasons existed under the CITY's policies, past practices, procedures and/or supervisory instructions to justify the discrimination against JOHNSON.

100.    The alleged basis for JOHNSON's termination was mere pretext for discrimination, which, JOHNSON contends, was corroborated by the disparate treatment

17

afforded to the non-Caucasian and non-male peers of JOHNSON referenced in paragraphs 45 through 68 herein.\5

101. As a direct, proximate and foreseeable result of the actions by the CITY through Chief O'Dell, JOHNSON has suffered past and future pecuniary losses, emotional pain, suffering, embarrassment, humiliation, inconvenience and mental anguish, loss of enjoyment of life, loss of dignity, damage to his name and reputation, emotional distress and other non-pecuniary losses and intangible injuries.

102. Specifically, through actions of the CITY's agents and employees, most notably Chief O'Dell, JOHNSON has been tangibly harmed concerning the terms and conditions of his employment, which damages include loss of pay and benefits; damage to his chosen career path,

---

[5] In addition to the examples of minorities receiving little to no discipline for more egregious conduct and/or KPD policy violations include, other officers engaged in MORE serious conduct than for which JOHNSIN was accused but remain employed. They include, are not limited to:

(a). Sgt. Raquel Fernandez – merely a suspension for leaving her firearm unsecured in her house with her kids under the age of 18. In addition, upon information and belief, Sgt. Fernandez Raquel got her schedule changed and practically anything she wanted and was permitted to cheat on her promotional exam, for which Chief O'Dell allegedly did not deny. Rather, in an official investigation he said it was merely a mistake;

(b) Jacob Mills had an IA in 2016 for which he could or should have been placed on the "Brady List" for the incident, but was not;

(c) Patrick Smith allegedly slept with an arrestee after her husband dropped the domestic violence charges and received only minor discipline;

(d) Lenora Wooten engaged in an unauthorized pursuit that "was swept under the rug";

(e) George Montgomery who worked with Chief O'Dell at OPD, had "created" for him a new position to permit Chief O'Dell to bring George Montgomery with him to the KPD. This was despite Montgomery previously allegedly being disciplined for a social media violation and receiving only an 8 hour suspension (IA 21-010); and

(f) Lt. Erika Castellucci - was arrested on charges of misdemeanor battery and false imprisonment in December 2021. The KPD made several calls to the State Attorney's Office (SAO) to "see if charges were filed or dropped yet," which was not done for the others. Once the SAO decided not to file charges, they created a "Administrative Watch Commander" position for Lt. Castellucci, and she was allowed to come to work in her patrol vehicle in plain clothes and act as Watch Commander, approving reports and activity. It came to the attention of IA that she and others were granted the opportunity to mediate with the Chief about the incident, while an injunction was yet still in place. IA sustained the allegations against Lt. Castellucci, and she was given a 160 hour suspension. Lt. Castelluci was sent home while on duty because she found out the City Manager wanted to terminate her. The KPD was going to demote her to the rank of Corporal. However, she allegedly threw a fit and was going to grieve the decision and got sent home. Instead of a demotion or termination, she was merely suspended. Lt. Castelluci then sent an email within the KPD that she would be out on "vacation" for the 160 hours.

including the damage by being required to spend money in an effort to secure other employment; loss of future retirement and pension benefits, damage to his reputation, both as a person and as a public servant, damage by loss of dignity; as well as severe emotional anguish and distress.

103.    JOHNSON has engaged the services of legal counsel and is obligated to pay legal counsel fees incurred in the prosecution of this action.

104.    JOHNSON is entitled to and seeks an award of attorney's fees for bringing this action as part of his costs, pursuant to 42 U.S.C. §1988.

<u>**CONDUCT COMPLAINED OF:**</u>

**COUNT I**

<u>**UNLAWFUL RETALIATION UNDER THE FIRST AMENDMENT**</u>

105.    This is an action redress the deprivation by the CITY of Plaintiff's right to freedom of speech, as protected by the First and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. §1983.

106.    Accordingly, JOHNSON accordingly repeats, adopts and re-alleges the allegations of paragraphs 1 through 104, as if set forth more fully herein.

107.    The conduct complained of herein was taken under color of the laws of the State of Florida.

108.    The persons who engaged in the conduct of which JOHNSON complains, through Chief O'Dell, was of such position and authority so that his acts may fairly be said to constitute the official expressions of the CITY's custom, policy or usage.

109.    In fact, Chief O'Dell is the final policy and ultimate decision makers for the CITY's Police Department in terms of policy and personnel matters.

110.   The CITY violated Plaintiff's constitutional right to freedom of speech by engaging in the conduct complained of in paragraphs 23 through 28, 39 through 60, and 96 - 97 herein, the conduct being initiated, carried out and continued by the CITY in direct retaliation for JOHNSON's  actions in exercising his right to freedom of speech as a private citizen on matters of public concern, while off duty and not representing the CITY.

111.   JOHNSON's Facebook Posts were protected by the First and Fourteenth Amendments to the Constitution of the United States, as a matter of law.

112.   No legitimate governmental interest was served by denial of JOHNSON's  free speech rights.

113.   Further, JOHNSON's Facebook Posts did not impair or impugn the functioning of the KPD.

114.   JOHNSON's right to free speech, especially while off duty, was clearly established at the time of the pretextual performance-based allegations lodged against him.

115.   Plaintiff JOHNSON would not have been terminated but for his constitutionally protected speech activities, namely his Facebook Posts.

116.   As a result of the conduct by the CITY, through the deliberate and willful actions of Chief O'Dell in retaliation for JOHNSON's exercise of his constitutionally protected right to freedom of speech, JOHNSON has been subjected to deprivation of his rights as secured and protected to him by the First and Fourteenth Amendments to the Constitution of the United States and has been thereby damaged.

117.   Plaintiff is entitled to and seeks an award of attorney's fees for bringing this action, as part of his costs, pursuant to 42 U.S.C. §1988.

WHEREFORE, Plaintiff JOHNSON respectfully prays:

(a) that he be awarded back pay and benefits between the date he was terminated and the date of judgment in this matter, less any interim earnings;

(b) that a Final Order be entered directing CITY to place JOHNSON into his former position of Patrol Officer, or to a substantially equivalent position with equal pay, benefits, rights and privileges;

(c) that all of his full fringe benefits and seniority rights to which he would have enjoyed and been entitled, but for the adverse action, retroactive to the date of his termination;

(d) that he be awarded compensatory damages in excess of $75,000.00 against the Defendant CITY for: past and future lost compensation caused by the loss of any salary or merit increases; for damage to his career; for damages for severe mental anguish and suffering; for damage to JOHNSON's reputation as an individual and as a public employee; and for other direct and consequential damages suffered by Plaintiff as the direct and proximate result of all of the Defendant's actions in violation of Plaintiff's clearly established constitutional right to free speech;

(e) that he be awarded prejudgment interest;

(f) that a Final Order be entered directing that all disciplinary actions, negative comments, and claims of performance deficiencies against JOHNSON and forming a matter of public record be expunged, or declared to have been improperly issued, to the extent permissible by Florida law;

(g) that a Final Order be entered directing the CITY to not retaliate against JOHNSON and other similarly situated minority employees in the future for the exercise of their First Amendment rights;

(h) that JOHNSON be awarded front pay and benefits for a reasonable time, within the discretion of this Court, in lieu of reinstatement, if determined that reinstatement is impossible or impractical;

(i) that JOHNSON be awarded costs of this action, including reasonable attorney's fees as a part of his costs, pursuant to 42 U.S.C.§1988; and

(j) that JOHNSON be awarded such other legal and/or equitable relief as may be deemed appropriate by this Court.

**COUNT II**

**UNLAWFUL RACE DISCRIMINATION UNDER 42 U.S.C. §1981 \\[6]**

118.    This is an action for intentional unlawful race discrimination against the CITY, as prohibited by 42 U.S.C. §1981, and brought pursuant to 42 U.S.C. §1983.

119.    This count is pled cumulatively and in the alternative to Counts I and V. Accordingly, JOHNSON repeats, adopts and re-alleges the allegations of paragraphs 1 through 117 and 141 - 150, as if set forth more fully herein.

120.    The conduct complained of herein was taken under color of the laws of the State of Florida and the United States.

---

[6] The U.S. Supreme Court has held that 42 U.S.C. 1981 applies equally to white persons as well as non-white persons. *See McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 286-87 (1976).

121.    The persons who engaged in the conduct of which JOHNSON complains, i.e., Chief O'Dell, was of such position and authority so that his acts may fairly be said to constitute the official expression of the CITY's custom, policy or usage.

122.    As described in paragraphs 62 through 74, 80 – 87, 92 – 94 and 100 herein, JOHNSON was subjected to discrimination by virtue of disparate treatment as compared to his Black/African-American and Hispanic peers.

123.    Intentional race discrimination is unlawful, and clearly established as such, pursuant to 42 U.S.C. §1981.

124.    JOHNSON's discharge upon the conduct/policy-based allegations, but actually on the basis of his race, constitutes an unlawful discriminatory act within the meaning of 42 U.S.C. §1981.

125.    At all times material hereto, the CITY, through its authorized agents and employees, and especially Chief O'Dell, was and is aware that race discrimination is prohibited under 42 U.S.C. §1981.

126.    Nonetheless, the CITY, through its authorized agents and employees, including Chief O'Dell, engaged in conduct, including terminating JOHNSON, in willful disregard of his civil rights, while attempting to disguise such violations with a purported legitimate reason, in violation of 42 U.S.C. §1981.

WHEREFORE, Plaintiff JOHNSON respectfully prays:

   a)  that he be awarded back pay and benefits between the date he was terminated and the date of judgment in this matter, less any interim earnings;

b) that a Final Order be entered directing CITY to place JOHNSON into his former position of Patrol Officer, or to a substantially equivalent position with equal pay, benefits, rights and privileges;

c) that all of his full fringe benefits and seniority rights to which he would have enjoyed and been entitled, but for the adverse action, retroactive to the date of his termination;

d) that he be awarded compensatory damages in excess of $75,000.00 against the Defendant CITY for: past and future lost compensation caused by the loss of any salary or merit increases; for damage to his career; for damages for severe mental anguish and suffering; for damage to JOHNSON's reputation as an individual and as a public employee; and for other direct and consequential damages suffered by Plaintiff as the direct and proximate result of all of the Defendant's actions in violation of Plaintiff's clearly established civil rights;

e) that he be awarded prejudgment interest;

f) that a Final Order be entered directing CITY to not discriminate against JOHNSON and other similarly situated employees in the future;

g) that a Final Order be entered directing that all disciplinary actions, negative comments, and claims of performance deficiencies against JOHNSON and forming a matter of public record be expunged, or declared to have been improperly issued, and removing JOHNSON"s name from the "Brady" list, to the extent permissible by Federal and Florida law;

h)  that JOHNSON be awarded front pay and benefits for a reasonable time, within the discretion of this Court, in lieu of reinstatement, if determined that reinstatement is impossible or impractical;

i)  that JOHNSON be awarded costs of this action, including reasonable attorney's fees as a part of his costs, pursuant to 42 U.S.C.§1988; and

j)  that JOHNSON be awarded such other legal and/or equitable relief as may be deemed appropriate by this Court.

**COUNT III**

**UNLAWFUL RACE DISCRIMINATION UNDER TITLE VII**

127.    This is an action for intentional unlawful race discrimination against the CITY, as prohibited by Title VII of the Civil Rights Act ("Title VII").

128.    This count is pled cumulatively with Counts I and V, and in the alternative to Count II.    Accordingly, JOHNSON hereby readopts, realleges and incorporates paragraphs 1 through 117 and 141 - 150, as set forth more fully herein.

129.    As described in paragraphs 62 through 74, 80 – 87, 92 – 95 and 100 herein, JOHNSON was subjected to discrimination by virtue of disparate treatment as compared to his Black/African-American, and Hispanic minority peers.

130.    Intentional race discrimination is unlawful, and clearly established as such, pursuant to Title VII.

131.    JOHNSON's discharge upon the conduct/policy-based allegations, but actually on the basis of his race, constitutes an unlawful discriminatory act within the meaning of Title VII.

132. At all times material hereto, the CITY, through its authorized agents and employees, including Chief O'Dell, was and is aware that race discrimination is prohibited under Title VII.

133. Nonetheless, the CITY, through its authorized agents and employees, including Chief O'Dell, engaged in conduct, including terminating JOHNSON, in willful disregard of his civil rights, while attempting to disguise such violations with a purported legitimate reason, in violation of Title VII.

WHEREFORE, Plaintiff JOHNSON respectfully prays:

a) that he be awarded back pay and benefits between the date he was terminated and the date of judgment in this matter, less any interim earnings;

b) that a Final Order be entered directing CITY to place JOHNSON into his former position of Patrol Officer, or to a substantially equivalent position with equal pay, benefits, rights and privileges;

c) that all of his full fringe benefits and seniority rights to which he would have enjoyed and been entitled, but for the adverse action, retroactive to the date of his termination;

d) that he be awarded compensatory damages in excess of $75,000.00 against the Defendant CITY for: past and future lost compensation caused by the loss of any salary or merit increases; for damage to his career; for damages for severe mental anguish and suffering; for damage to JOHNSON's reputation as an individual and as a public employee; and for other direct and consequential damages suffered by

Plaintiff as the direct and proximate result of all of the Defendant's actions in violation of Plaintiff's clearly established civil rights;

e)   that he be awarded prejudgment interest;

f)   that a Final Order be entered directing CITY to not discriminate against JOHNSON and other similarly situated employees in the future;

g)   that a Final Order be entered directing that all disciplinary actions, negative comments, and claims of performance deficiencies against JOHNSON and forming a matter of public record be expunged, or declared to have been improperly issued, and removing JOHNSON"s name from the "Brady" list, to the extent permissible by Federal and Florida law;

h)   that JOHNSON be awarded front pay and benefits for a reasonable time, within the discretion of this Court, in lieu of reinstatement, if determined that reinstatement is impossible or impractical;

i)   that JOHNSON be awarded costs of this action, including reasonable attorney's fees as a part of his costs, pursuant to 42 U.S.C.§1988; and

j)   that JOHNSON be awarded such other legal and/or equitable relief as may be deemed appropriate by this Court.

**COUNT IV**

**UNLAWFUL SEX/GENDER DISCRIMINATION UNDER TITLE VII**

134.    This is an action for intentional unlawful sex/gender discrimination against the CITY, as prohibited by Title VII of the Civil Rights Act ("Title VII").

135.    This count is pled cumulatively with Counts I, III and V, and in the alternative to Count II.    Accordingly, JOHNSON hereby readopts, realleges and incorporates paragraphs 1 through 117, 127 – 133, and 141 - 150,  as set forth more fully herein.

136.    As described in paragraphs 75 through 83, 92 - 93, 95 and 100 herein, JOHNSON was subjected to discrimination by virtue of disparate treatment as compared to his female  peers.

137.    Intentional sex/gender discrimination is unlawful, and clearly established as such, pursuant to Title VII.

138.    JOHNSON's discharge upon the conduct/policy-based allegations, but actually on the basis of his sex/gender, constitutes an unlawful discriminatory act within the meaning of Title VII.

139.    At all times material hereto, the CITY, through its authorized agents and employees, including Chief O'Dell, was and is aware that sex/gender discrimination is prohibited under Title VII.

140.    Nonetheless, the CITY, through its authorized agents and employees, including Chief O'Dell, engaged in conduct, including terminating JOHNSON, in willful disregard of his civil rights, while attempting to disguise such violations with a purported legitimate reason, in violation of Title VII.

WHEREFORE, Plaintiff JOHNSON respectfully prays:

a)   that he be awarded back pay and benefits between the date he was terminated and the date of judgment in this matter, less any interim earnings;

b) that a Final Order be entered directing CITY to place JOHNSON into his former position of Patrol Officer, or to a substantially equivalent position with equal pay, benefits, rights and privileges;

c) that all of his full fringe benefits and seniority rights to which he would have enjoyed and been entitled, but for the adverse action, retroactive to the date of his termination;

d) that he be awarded compensatory damages in excess of $75,000.00 against the Defendant CITY for: past and future lost compensation caused by the loss of any salary or merit increases; for damage to his career; for damages for severe mental anguish and suffering; for damage to JOHNSON's reputation as an individual and as a public employee; and for other direct and consequential damages suffered by Plaintiff as the direct and proximate result of all of the Defendant's actions in violation of Plaintiff's clearly established civil rights;

e) that he be awarded prejudgment interest;

f) that a Final Order be entered directing CITY to not discriminate against JOHNSON and other similarly situated employees in the future;

g) that a Final Order be entered directing that all disciplinary actions, negative comments, and claims of performance deficiencies against JOHNSON and forming a matter of public record be expunged, or declared to have been improperly issued, and removing JOHNSON"s name from the "Brady" list, to the extent permissible by Federal and Florida law;

h) that JOHNSON be awarded front pay and benefits for a reasonable time, within the discretion of this Court, in lieu of reinstatement, if determined that reinstatement is impossible or impractical;

i) that JOHNSON be awarded costs of this action, including reasonable attorney's fees as a part of his costs, pursuant to 42 U.S.C.§1988; and

j) that JOHNSON be awarded such other legal and/or equitable relief as may be deemed appropriate by this Court.

**COUNT V**

**DEPRIVATION OF LIBERTY INTEREST**

141.   This is a claim for the deprivation of JOHNSON's public and occupational name and reputation, as protected by the Fifth and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. §1983.

142.   This count is pled cumulatively with all counts. Accordingly, JOHNSON hereby readopts, realleges and incorporates paragraphs 1 through 140, as if set forth more fully herein.

143.   The conduct complained of herein, including paragraphs  herein, was taken under color of the laws of the State of Florida and the United States.

144.   The persons who engaged in the conduct of which JOHNSON complains, i.e., Chief O'Dell, were and are of such position and authority so that their acts may fairly be said to constitute the official expression of the CITY's custom, policy or usage.

145.   At all times material hereto, and prior to the conduct complained of herein, JOHNSON possessed a property interest in his good name and reputation in his law enforcement

career with the CITY and was recognized as someone who was competent in the performance of his duties.

146.    By terminating JOHNSON  upon the conduct/policy-based allegations,  that were knowingly false and merely a pretext because of JOHNSON's exercise of free speech (for his personal political views), and/or because of his race or sex/gender, with the pretextual reasons placed in his personnel file and in records believed to have been submitted to the Florida Department of Law Enforcement ("FDLE") and made a matter of public record, the CITY, through Chief O'Dell, has falsely stigmatized JOHNSON.

147.    The laws prohibiting falsely accusing a public servant, such as JOHNSON, with stigmatizing allegations, such as conduct unbecoming, as noted in paragraphs 34 - 36, 88 – 90 and 98 herein,  is clearly established.

148.    Moreover, JOHNSON was not afforded any opportunity to contest the allegations against him nor provided a name-clearing opportunity.

149.    The CITY's actions, through Chief O'Dell, also resulted in the publication of damaging and stigmatizing news media coverage as set forth in paragraphs 35 – 36 herein, as well as disclosure to the general public and potential employers.

150.    The false and stigmatizing documents made a matter of public information have caused damage to JOHNSON and have and will likely continue to impair his ability to gain employment within his chosen career field of law enforcement.

WHEREFORE, Plaintiff JOHNSON respectfully prays:

    a)  that he be awarded back pay and benefits between the date he was terminated and the date of judgment in this matter, less any interim earnings;

b)  that a Final Order be entered directing CITY to place JOHNSON into his former position of Patrol Officer, or to a substantially equivalent position with equal pay, benefits, rights and privileges;

c)  that all of his full fringe benefits and seniority rights to which he would have enjoyed and been entitled, but for the adverse action, retroactive to the date of his termination;

d)  that he be awarded compensatory damages in excess of $75,000.00 against the Defendant CITY for: past and future lost compensation caused by the loss of any salary or merit increases; for damage to his career; for damages for severe mental anguish and suffering; for damage to JOHNSON's reputation as an individual and as a public employee; and for other direct and consequential damages suffered by Plaintiff as the direct and proximate result of all of the Defendant's actions in violation of Plaintiff's clearly established civil rights;

e)  that he be awarded prejudgment interest;

f)  that a Final Order be entered directing CITY to not falsely accuse JOHNSON and other similarly situated employees in the future;

g)  that a Final Order be entered directing that all disciplinary actions, negative comments, and claims of performance deficiencies against JOHNSON and forming a matter of public record be expunged, or declared to have been improperly issued, and removing JOHNSON"s name from the "Brady" list, to the extent permissible by Federal and Florida law;

h) that JOHNSON be awarded front pay and benefits for a reasonable time, within the discretion of this Court, in lieu of reinstatement, if determined that reinstatement is impossible or impractical;

i) that JOHNSON be awarded costs of this action, including reasonable attorney's fees as a part of his costs, pursuant to 42 U.S.C.§1988; and

j) that JOHNSON be awarded such other legal and/or equitable relief as may be deemed appropriate by this Court.

## **DEMAND FOR JURY TRIAL**

Plaintiff, ANDREW R. JOHNSON, hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Dated this <u>28th</u> day of September, 2022.

Respectfully submitted,

*/s Gary D. Wilson*
Gary D. Wilson, Esq.
Florida Bar No.: 0846406
WILSON McCOY, P.A.
100 E. Sybelia Avenue, Suite 205
Maitland, Florida  32751
Telephone:  (407) 803-5400
Facsimile:  (407) 803-4617
Primary email: gwilson@wilsonmccoylaw.com
Secondary email: jbarrero@wilsonmccoylaw.com

**Attorneys for Plaintiff, Andrew R. Johnson**

## <u>VERIFICATION</u>

Personally appeared before the undersigned, ANDREW R. JOHNSON, who being first duly sworn, deposes and says that the allegations of this Verified Complaint, consisting of paragraphs 1 through _150_, inclusive, are true and correct to the best of his knowledge, information and belief.

ANDREW R. JOHNSON

STATE OF FLORIDA    )

COUNTY OF OSCEOLA)

The foregoing instrument was acknowledged before me this _28_ day of _September_, 2022, by Andrew R. Johnson, who is personally known to me or who has produced _FL DL_ as identification, and who did take an oath.

Notary Public

My Commission Expires: _Sept. 29, 2024_

Seal:



JENNIFER WALZ
MY COMMISSION # HH 047923
EXPIRES: September 29, 2024
Bonded Thru Notary Public Underwriters