UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ANDREW R. JOHNSON,**

**Plaintiff,**

v.                                                      **Case No.  6:22-cv-1778-CEM-DCI**

**CITY OF KISSIMMEE,**
**FLORIDA,**

**Defendant.**
_____/

## ORDER

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment ("Motion," Doc. 25), to which Plaintiff filed a Response (Doc. 32) and Defendant filed a Reply (Doc. 34). For the reasons set forth below, Defendant's Motion will be granted in part and denied in part.

## I.    BACKGROUND

Plaintiff was employed by Defendant as a police officer. (Personnel Action Form, Doc. 24-10, at 15). During the relevant timeframe, Plaintiff was within his first twelve months of employment, so he was still considered a probationary employee. (*Id.* (noting that Plaintiff's "[o]ne year probationary period begins once" Plaintiff completed his training); Pl. Dep., Doc. 24-4, at 82 (stating that he had three months left of his probationary period when his employment was terminated)).

While employed, Plaintiff made numerous posts on his Facebook account, which ultimately led to his termination. A sampling[1] of these posts are replicated below.[2]

- August 22, 2020: Plaintiff reposted the below image with two 💯 emojis.



(Bowman Email, Doc. 24-3, at 21; Enhanced Images, Doc. 24-8, at 3).

- August 27, 2020: Plaintiff posted the below image with two crying laughing emojis.



---

[1] All twenty-four posts are included at Docket Entry 24-3.

[2] These posts were filed with the Court in several exhibits. They are all the same, but the Court has utilized the clearest picture available for each post.

(Doc. 24-3 at 15; Doc. 24-8 at 21).

- August 27, 2020: Plaintiff reposted the below image, referencing Jacob Blake who was paralyzed after being shot in the back by law enforcement, (Doc. 24-4 at 203–04), with three crying laughing emojis and three facepalm emojis.



(Doc. 24-3 at 16).

- September 1, 2020: Plaintiff posted the below image and article with the statement, "This is some bullshit [two cursing emojis]. Civil War is right around the corner, prepare for it now."



(*Id.* at 11; Doc. 24-8 at 18).

- September 1, 2020: Plaintiff posted the below meme, which was presumed to be referring to the incident where Kyle Rittenhouse shot three protesters. (Holland Dep., Doc. 30-8, at 6; May 17, 2023 Holmberg Dep., Doc. 30-2, at 50). Along with the image, Plaintiff posted the statement, "I'm sayin…." with two shrugging emojis.



(Doc. 24-3 at 12; Doc. 24-8 at 19).

- September 16, 2020: Plaintiff shared a news article about the 9/11 attacks. In response to someone commenting on his post that "[p]eople should just get over it and move on," Plaintiff stated, "get over it and move on??? You mean like the whole slavery thing?" (Doc. 24-3 at 8).

- September 24, 2020: Plaintiff reposted a post asking to keep "the officers from Louisville Metro Police Department, and other first responders down there in your thoughts and prayers tonight," (*Id.* at 6), which was referencing the protests occurring in Louisville, Kentucky surrounding the death of Breonna Taylor, (Doc. 24-4 at 225–26). In sharing this post, Plaintiff stated: "Louisville is the wrong place to do this. KY backwoods boys gonna show up!! They're gonna FAAFO!!!"[3] (Doc. 24-3 at 6).

- October 4, 2020: Plaintiff reposted the following image with two crying laughing emojis and one facepalm emoji.

---

[3] "FAAFO" stands for "fuck around and find out." (Doc. 24-4 at 224).



(*Id.* at 5).

- December 17, 2020: Plaintiff posted the following image with the statement "Be prepared!!! D.N.I. is possibly tomorrow…. Do your research #devilsstorm troops are preparing and China has deployed troops to Canada. WW3 is coming!!!"



(*Id.* at 23; Doc. 24-8 at 26).

- January 6, 2021: During the attack on the United States Capitol, Plaintiff reposted an image of a crowd at the Capitol with the caption "Do you hear us, America? We're not going away any time soon!"

(Doc. 24-3 at 24). In sharing the image, Plaintiff posted: "The silent majority will rise!! Day one of the Revolutionary War!! Hang on, it's only just begun" with two shrugging emojis and the hashtag #fuckaroundandfindout. (*Id.*; Doc. 24-8 at 26).

- January 6, 2021: In the comments section on the previous post, an individual commented "You cool with this gang of thugs fighting the police?" to which Plaintiff responded, "why not at least we got a legitimate reason. Everyone was ok with them burning cities and acting stupid killin people." (Doc. 24-3 at 25).

On January 12, 2021, Defendant received an email to its internal affairs department from an individual called Madison Bowman[4] that included many screenshots of Plaintiff's Facebook posts, including those referenced above. (*Id.* at 1). The email stated:

> This officer is a very big problem. Not only is he a very big supporter of what happened recently in dc but as you'll see by the attached screen shots has posted some very inappropriate things overtime and in having conversations face to face with this man has said some massively concerning things as well. I believe he is incapable of doing his job without bias which as we know is a massive problem for police in this country.

(*Id.*).

---

[4] Plaintiff believes that this is a pseudonym, but the precise identity of the citizen who submitted this information is irrelevant at this time.

Plaintiff was placed on administrative leave with pay that day. (Jan. 12, 2021 Mem., Doc. 24-15, at 1). Defendant terminated Plaintiff's employment two days later. (Jan. 14, 2021 Mem., Doc. 24-16, at 1). Defendant did not advise Plaintiff of the reason for his termination at the time. (*See id.*; Doc. 24-4 at 258). Plaintiff maintains that he first learned the reason from a TV news story. (Doc. 24-4 at 182–84). There was also at least one news article written about Plaintiff's termination. (Orlando Sentinel Article, Doc. 24-14, at 1–5).

Subsequent to Plaintiff's termination, Defendant submitted information regarding the termination to the State Attorney's office for determination of whether Plaintiff should be added to the Brady List. The Brady List is a list maintained in accordance with Florida Statute sections 112.531 and 112.536, which permits a prosecuting agency to maintain an identification system "of the name or names of law enforcement officers . . . about whom a prosecuting agency is in possession of impeachment evidence" in order to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). Ultimately, Plaintiff was added to the Brady List.

As a result of his termination, his addition to the Brady List, and the media coverage surrounding his termination, Plaintiff has brought the following claims: retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983 (Count

I); race discrimination in violation of 42 U.S.C. § 1981 pursuant to § 1983[5] (Count II); race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count III); sex/gender discrimination in violation of Title VII (Count IV); and deprivation of liberty interest in violation of the Fifth and Fourteenth Amendments pursuant to § 1983 (Count V). Defendant has moved for summary judgment as to all claims.

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts

---

[5] "When a plaintiff sues a state actor under section 1981 for damages for an alleged violation of his rights, he must proceed under section 1983." *Holmes v. City of Ft. Pierce*, No. 20-13170, 2022 U.S. App. LEXIS 2607, at *11 (11th Cir. Jan. 27, 2022) (*citing Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989)).

and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen*, 121 F.3d at 646).

## III.   ANALYSIS

### A.     Waiver

As an initial matter, Defendant repeatedly makes arguments that Plaintiff has waived his right to bring any of his claims. Defendant's argument is premised on a document titled "Probationary Period At Will Employment" (Doc. 24-1), which Plaintiff signed at the beginning of his employment with Defendant. This document states:

> I understand and accept that I must successfully complete a one year probationary period if I am employed by the Kissimmee Police Department. This one year period begins once I have completed the Officer Field Training Program. As a probationary employee, I understand that I may be discharged at will with no entitlement to any administrative appeal. I acknowledge that, during the probationary period the Kissimmee Police Department has the exclusive right to discharge me for any or no reason.

(Doc. 24-1 at 1).

Defendant is attempting to construe this document as a waiver of any and all claims stemming from Plaintiff's employment with Defendant. Defendant's reading of this document is untenable. For context, Defendant has a grievance procedure, which includes administrative appeal rights, (*see* Def.'s Policies, Doc. 24-12, at 8–10), but these procedures are not available to probationary employees, (*id.* at 9, 17). By its plain language, the above document is an acknowledgement that while Plaintiff was a probationary employee, he was an at-will employee and did not have

the benefit of the additional grievance procedures. (*See also* Doc. 30-8 at 14–15 (explaining that during the probationary period "it's like an at-will employee"). It does not waive any claims of discrimination or civil rights violations. *See Selby v. Tyco Healthcare Grp., L.P.*, 301 F. App'x 908, 910 (11th Cir. 2008) (recognizing that Plaintiff, as an at-will employee, could be terminated "at any time, for any reason" in dismissing her wrongful termination claim but still considering the merits of her race discrimination and retaliation claims under Title VII and § 1981); (Doc. 30-8 (indicating that there is no period in which Defendant can discriminate against any employee, regardless of whether they are a probationary or not)).

### B. Administrative Remedies

Next, Defendant argues that Plaintiff cannot pursue his First Amendment retaliation claim and his deprivation of a liberty interest claim—which are both brought pursuant to § 1983—because he did not include those claims in his charge of discrimination filed with the Equal Employment Opportunity Commission and thus failed to exhaust his administrative remedies. But "there is no requirement that a plaintiff exhaust his administrative remedies before filing suit under § 1983." *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1226 (11th Cir. 2006). Defendant is not entitled to summary judgment on this basis.

### C.   *Monell* **Liability**

Defendant next argues that it cannot be held liable for Plaintiff's § 1983 claims because Plaintiff fails to prove a basis for *Monell* liability.[6] "Under section 1983, a local government is responsible for an injury inflicted by its employee only when the injury is inflicted by the 'execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Holmes v. City of Ft. Pierce*, No. 20-13170, 2022 U.S. App. LEXIS 2607, at *11 (11th Cir. Jan. 27, 2022) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Plaintiff brings two types of § 1983 claims— those based on the termination of his employment (First Amendment retaliation and § 1981 race discrimination[7]) and those based on statements made by Defendant without giving Plaintiff an opportunity to clear his name (liberty interest).

As to the first type of § 1983 claim, "[a]n 'employment decision, such as termination,' qualifies as a municipal policy if the 'decisionmaker possesse[d] final authority to establish municipal policy with respect to the action.'" *McCarthy v. City of Cordele, Ga.*, 111 F.4th 1141, 1146 (11th Cir. 2024) (quoting *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1325 (11th Cir. 2003)). Here, the police chief at the time of

---

[6] Defendant also throws in an argument that Plaintiff's Complaint constitutes a shotgun pleading, but Defendant filed an Answer (Doc. 12), and this case has progressed to the summary judgment stage; arguments that Plaintiff failed to state a claim in his Complaint are no longer appropriate.

[7] As noted above, Plaintiff's § 1981 race discrimination claims are brought through the mechanism of § 1983.

Plaintiff's termination, Jeffery O'Dell, testified that he was the final and only decisionmaker regarding Plaintiff's termination. (O'Dell Dep., Doc. 30-1, at 4, 71). And, as Defendant has reiterated at length, as a probationary employee, Plaintiff did not have any appeal or review options as to this decision. *Cf. Gilroy v. Baldwin*, 843 F. App'x 194, 198 (11th Cir. 2021) (explaining "that a decisionmaker was not a policymaker" where "a reviewing council had the power 'to reverse any termination decision made by' the decisionmaker" (quoting *Quinn*, 330 F.3d at 1326)). Thus, O'Dell may qualify a policymaker in this instance. Defendant has failed to show that it is entitled to summary judgment as to *Monell* liability regarding Plaintiff's First Amendment and race discrimination § 1983 claims.

Plaintiff's liberty claim is based on two purported actions by Defendant: putting Plaintiff on the Brady List and making defamatory statements about Plaintiff relating to his termination without an opportunity to clear his name. As to the Brady List, the evidence is clear that Defendant has no control over who is added to the Brady List and therefore cannot have a custom or policy in that regard; nor is Defendant the final policymaker. (*See* Doc. 24-4 at 57–58 (indicating that Plaintiff did not know who added him to the Brady List and testifying that he believed Defendant could make a recommendation but that the final decision was made by the state attorney); Doc. 30-1 at 106–07 (stating that, per the state attorney's office policy, when a law enforcement officer "is relieved of duty" Defendant is "to give

[the state attorney] a heads up" for her to then "consider Brady notifications"); *id.* at 115 (explaining that O'Dell had "nothing [to do with] who goes on the Brady List" and that he did not "have a vote"). Thus, there is no basis to impose *Monell* liability on Defendant for Plaintiff being added to the Brady List. *Gilroy*, 843 F. App'x at 198.

As to the defamatory statements, neither party adequately addresses this issue. However, at the summary judgment stage, the Court must construe everything in favor of the nonmoving party. "[A] public employer is required to provide the opportunity for a post-termination name-clearing hearing when stigmatizing information is made part of the public records, or otherwise published." *Buxton v. Plant City*, 871 F.2d 1037, 1046 (11th Cir. 1989). Assuming there was such information placed into Plaintiff's personnel file—which is an issue that Defendant does not address in its Motion—there is evidence that the file was disclosed to the media. (*See generally* Doc. 24-14 (referencing, in a news article about Plaintiff's termination, "records" as the source of most information)). Generously reading the record, and keeping in mind that at this stage it is Defendant's burden to establish that it is entitled to summary judgment, the Court must presume that these alleged statements were added to Plaintiff's employment file and disclosed to the public via an official policy. Additionally, there is evidence to support the contention that not providing Plaintiff a hearing was part of Defendant's official policy. (*See* Doc. 24-

12 at 9–17 (providing that Plaintiff, as a probationary employee, was not entitled to any grievance procedures). Defendant simply does not address this issue, and therefore, has not met its burden at this stage.

Because Defendant has not shown it is entitled to summary judgment on all of Plaintiff's claims on the basis of *Monell* liability, the Court will move on to the substantive arguments as to each remaining claim.

### D.    Liberty Interest Claim

"[D]amage to reputation, standing alone, does not provide a basis for an action under 42 U.S.C. § 1983," but "when reputational damage is sustained in connection with a termination of employment, it may give rise to a procedural due process claim for deprivation of liberty which is actionable under section 1983." *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000). "To recover, a plaintiff must satisfy a six-factor test and show that (1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) [was] made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing." *Id.* (quotation omitted). If "adequate state remedies were available to provide Plaintiff with the opportunity for a name clearing hearing," then the final element is not satisfied, and the liberty interest claim fails. *Id.*

For purposes of this Motion, Defendant only addresses the final element— asserting that "Plaintiff could and should have utilized state procedures available to

him." (Doc. 25 at 17). However, Defendant does not elaborate on this argument. It merely cites a district court case where the state procedures available to a sheriff's deputy were sufficient. *Sammons v. Cameron*, 2:04-cv-161-FTM29DNF, 2005 WL 1027509, at *4 (M.D. Fla. Apr. 15, 2005). But, in Florida, there are separate statutory provisions governing the rights of sheriff's deputies, Fla. Stat. § 30.01 *et seq.*, and those of police officers, Fla. Stat. §§ 112.531–112.536. Defendant has provided no legal authority or even argument that the procedures available for deputy sheriffs are the same as those for police officers. Nor has Defendant addressed whether Plaintiff's probationary status impacts the availability of any such procedures.

Additionally, Defendant implies that Plaintiff's ability to speak with someone relating to an entirely different internal affairs investigation, who was not involved in the decision to terminate Plaintiff's employment, was sufficient to provide Plaintiff a hearing on the issue of his Facebook posts and termination. (Doc. 34 at 4). In this single-sentence argument thrown into its Reply, Defendant does not explain how this could have possibly provided Plaintiff with an opportunity for name-clearing regarding the Facebook posts.

It is entirely possible that there were adequate state remedies available to Plaintiff, but Defendant has utterly failed to identify any such remedies. Thus, Defendant has failed to meet its burden for summary judgment as to this claim. *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address

a "perfunctory and underdeveloped argument" with no citation to legal authority and collecting cases); *Watkins v. Goodyear Pension Plan*, No. 4:17-cv-461-VEH, 2018 U.S. Dist. LEXIS 70264, at *16–17 (N.D. Ala. Apr. 26, 2018) ("[U]nder the adversary system the Court does not serve as counsel's law clerk" (quotation omitted)).

### E.    Discrimination Claims

Plaintiff alleges that Defendant discriminated against him based on his race and sex and brings claims under to Title VII and § 1981. Specifically, § 1981 provides, in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."[8] 42 U.S.C. § 1981(a). First, Defendant argues that Plaintiff cannot prevail on his § 1981 claim because he was an at-will employee and therefore there was no "contract" at issue. While it does not appear that the Eleventh Circuit has directly addressed this issue, "[e]ach federal court of appeals that has explicitly decided the issue has held . . . that an at-will employee may maintain a claim under § 1981 for racially discriminatory employment practices" so long as the at-will employment has the essential elements of the

---

[8] Section 1981 prohibits discrimination in "employment against whites on the same terms as racial discrimination against nonwhites." *McCarthy v. City of Cordele, Ga.*, 111 F.4th 1141, 1146 (11th Cir. 2024) (quotation omitted). Thus, the fact that Plaintiff is white does not preclude him from bringing a race discrimination claim under § 1981.

applicable state-law definition of contract. *Skinner v. Maritz, Inc.*, 253 F.3d 337, 340 (8th Cir. 2001) (collecting cases from the Second, Tenth, Fourth, and Fifth Circuits); *see also Melton v. I-10 Truck Ctr., Inc.*, No. 3:21cv3061-MCR-ZCB, 2023 U.S. Dist. LEXIS 232098, at \*22 (N.D. Fla. Nov. 28, 2023) (noting that "[t]he Eleventh Circuit has implicitly recognized that at-will employment is considered legally protected from intentional race discrimination and thus within the scope of protection under § 1981" and collecting cases). "Florida law demonstrates that at-will employment provides a sufficient contractual relationship for the purpose of a § 1981 analysis." *Johnson v. Fam. Prac. & Injury Ctr., Inc.*, 437 F. Supp. 3d 1108, 1119 (M.D. Fla. 2020). Thus, it appears that Plaintiff is permitted to maintain a § 1981 claim even as an at-will employee, and Defendant has provided no legal authority in support of its contention otherwise.

"Title VII and § 1981 have the same requirements of proof and utilize the same analytical framework," *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011). When a Title VII or § 1981 disparate treatment claim is based on circumstantial evidence, as is the case here, the Eleventh Circuit dictates that the three-part *McDonnell Douglas* burden-shifting framework applies. *Johnson*, 948 F.3d at 1325 (citing *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, the plaintiff has the initial burden to establish a prima facie

case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case by a preponderance of the evidence, a presumption of discrimination arises. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981).

Once the plaintiff has presented a prima facie case and its attendant presumption arises, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. If the employer meets this burden, "the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quotation omitted). "An employer's stated reason is not a pretext unless it is shown that both: (1) the reason was false; and (2) the real reason was unlawful." *Vega v. Invsco Grp., Ltd.*, 432 F. App'x 867, 871 (11th Cir. 2011) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant

employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024–25.

However, "establishing the elements of the *McDonnell Douglas* framework is not . . . the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). If, despite failing to precisely establish the *McDonnell Douglas* elements, the plaintiff "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent"—i.e., "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker"—the plaintiff can still survive summary judgment. *Id.* (quotation and footnote omitted).

To establish a prima facie case, Plaintiff must prove "(1) that [ ]he belongs to a protected class, (2) that [ ]he was subjected to an adverse employment action, (3) that [ ]he was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019). For purposes of this Motion, Defendant only challenges the fourth element, asserting that Plaintiff's purported comparators were not similarly situated. "[T]o serve as a comparator" for this analysis, "an employee must be similarly situated to the plaintiff 'in all material respects.'" *Moreland-Richardson v. City of Snellville*, No. 19-14228, 2021 U.S. App.

LEXIS 29415, at *18 (11th Cir. Sep. 29, 2021) (quoting *Lewis*, 918 F.3d at 1224). "'[T]he sorts of similarities' that qualify an employee as a comparator" include: (1) engag[ing] in the same conduct or misconduct, (2) be[ing] subject to the same employment policy or rule, (3) work[ing] under the same supervisor, and (4) shar[ing] the same employment or disciplinary history as the plaintiff." *Id.* at *19 (quoting *Lewis*, 918 F.3d at 1227–28). However, "a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Lewis*, 918 F.3d at 1228. "A plaintiff needn't prove, therefore, that she and her comparators are identical save for their race or gender, as the case may be." *Id.* at 1227.

Plaintiff's first comparator is Lenora Wooten, who is a black female officer. The only social media post of Wooten's that is even somewhat similar to Plaintiff's was a post that Wooten was tagged in, which she did not like or comment on. The post contained images of "black females, and one of the females had a tattoo on her upper chest of a black fist," and the post's author stated: "I was able to collaborate with an amazing group of powerful WOC for the past couple of weeks. We all got to pay homage to the women of The Black Panther Party, All these gorgeous gals came together to create some great looks that showcase black excellence and pay homepage [sic] to the organization." (Apr. 13, 2022 Mem., Doc. 30-1, at 214; Wooten Social Media, Doc. 31-3, at 66–67). Plaintiff makes much out of the fact that this post references the Black Panther Party. But, unlike many of Plaintiff's

posts, nowhere is the post advocating violence or degrading anyone. Moreover, unlike Plaintiff's posts, this was a single post, and Wooten did not make the post, like it, or comment on it. Instead, she was simply tagged in it. The other social media posts relating to Wooten were not in any way substantively similar to Plaintiff's posts, and most of them occurred prior to Wooten's employment with Defendant. (Doc. 30-1 at 214; Doc. 31-3 at 66–76). Wooten is not a proper comparator because she did not engage in similar misconduct.

Next, Plaintiff references Astrid Cruz, a Hispanic female officer. (Doc. 30-1 at 157; 24-4 at 97). Cruz made a post on Facebook advertising a product "called 'G Code Nutrition,' which appeared to be a supplemental/workout company" with pictures of her in a law enforcement uniform and of her playing football. (Doc. 30-1 at 214; Cruz Social Media, Doc. 24-5, at 22). Plaintiff makes much about Cruz's attire in the football picture being "inappropriate" and calling it "lingerie." (Doc. 24-4 at 98; Doc. 32 at 20). However, in the picture, Cruz is wearing a cropped football jersey and a boy-short type bottom, covering more than many bathing suits. (Doc. 24-5 at 22). Cruz's social media posts can hardly be seen as similar in content or quantity to Plaintiff's posts. Cruz is not a proper comparator.

Plaintiff also points to Dickson Akadinma, a black male officer who was reprimanded for inappropriate behavior stemming from a call for service, due to Akadinma attempting to start a relationship with someone who had called for

service. (Akadinma Investigation Report, Doc. 24-14, at 57; Akadinma Notice of Disciplinary Action, Doc. 24-14, at 64–65). This is entirely different conduct, and Akadinma is not a proper comparator.

Finally, Plaintiff references Steven Somarriba,[9] a Hispanic male officer. (Doc. 24-4 at 257). Plaintiff cites evidence that Somarriba made social media posts that he was asked to take down. However, nowhere does Plaintiff provide the contents of those posts. Therefore, Plaintiff has not shown that Somarriba's conduct was sufficiently similar to Plaintiff's conduct. Accordingly, Plaintiff has not established that there were any similarly situated comparators that were treated more favorably than him. *See Husk v. City of Talladega*, No. 1:17-cv-01433-ACA, 2019 U.S. Dist. LEXIS 104709, at *10 (N.D. Ala. June 24, 2019) (determining that a comparator did not engage in substantially similar conduct because the comparator "shared one racially insensitive post and [the plaintiff] shared four" and the individuals' responses to the posts were different).

Moreover, even if Plaintiff had established a prima facie case, Defendant has offered a nondiscriminatory reason for Plaintiff's termination. The timeframe in which Plaintiff was making the relevant posts—fall 2020 through Jan 2021—was fraught with hostilities. There were nationwide protests following the death of

---

[9] Somarriba's last name is spelled in various ways in the transcripts, including Somberivo, (Doc. 24-4 at 257), and Summerriba, (Doc. 30-1 at 122).

George Floyd, a black man, at the hands of a police officer while in custody. (Doc. 24-4 at 186–87). There was an amplified divide between people supporting and people protesting law enforcement, which at times turned violent. (*See id.*). The tensions—particularly between law enforcement and communities of color—were extremely high. Additionally, following the 2020 election, the country was undergoing political upheaval while former President Trump was challenging the validity of the election. And, on the tail of these challenges, a group of protestors stormed the Capitol Building in an effort to prevent President Biden from taking office. (Doc. 24-4 at 235); Britannica, January 6 U.S. Capitol Attack, https://www.britannica.com/event/January-6-U-S-Capitol-attack (last visited Oct. 23, 2024). Given the landscape of the country at the time, it is clear that if Defendant treated Plaintiff differently than other employees who violated its social media policy, it was because the other violations did not implicate these volatile issues that were particularly impacting police departments. This is a nondiscriminatory[10] business reason for Plaintiff's termination, and Plaintiff has not established that the reason was pretextual. Thus, Defendant is entitled to summary judgment on Plaintiff's race and sex discrimination claims.

---

[10] Whether this reason is permissible under the First Amendment is a separate analysis that will be addressed below. In this analysis, the Court only holds that it is a nondiscriminatory reason.

### F.    First Amendment Retaliation

Plaintiff asserts that his First Amendment right to free speech was violated when his employment was terminated for his Facebook posts. "Although it's well-settled that a public employee may not be discharged or punished in retaliation for exercising [their] right to free speech under the First Amendment, it's also well-settled that a public employee's free-speech rights are not absolute." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1050 (11th Cir. 2022). Public employees "have a constitutional right, 'in certain circumstances, to speak as a citizen addressing matters of public concern.'" *McAlpin v. Sneads*, 61 F.4th 916, 934 (11th Cir. 2023) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

To establish a prima facie case of First Amendment retaliation, Plaintiff must prove: (1) his speech was "on a matter of public concern"; (2) his "First Amendment interest in engaging in the speech outweigh[ed]" Defendant's "interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees"; and (3) Plaintiff's "speech played a 'substantial part'" in Defendant's decision to terminate Plaintiff's employment. *Id.* at 934 (quoting *Anderson v. Burke Cnty.*, 239 F.3d 1216, 1219 (11th Cir. 2001)). In its Motion, Defendant does not challenge that Plaintiff was speaking on matters of public concern. (Doc. 25 at ("Assuming *arguendo* that Plaintiff['s] . . . postings did address issues of public concern . . . .")). But in its Reply, Defendant summarily makes a one-sentence

argument, citing no legal authority, that the postings were not on issues of public concern. The Court will not address such summary, unsupported arguments. Regardless, Plaintiff has failed to prove the second prong.

"Courts have routinely afforded substantial deference to public employers when disciplining an employee whose speech threatens to disrupt the efficient functioning of either the employer in general or the employee's department more specifically." *Snipes v. Volusia Cnty.*, 704 F. App'x 848, 852 (11th Cir. 2017). As such, "[t]he government's legitimate interest in avoiding disruption does not require proof of actual disruption." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 622 (11th Cir. 2015). "Reasonable possibility of adverse harm is all that is required." *Id.*; *Anderson*, 239 F.3d at 1220–21 ("[A] public employer need not wait for disruption or disturbance to occur before acting.").

At the point where Defendant terminated Plaintiff's employment, it had received a complaint from a concerned citizen—and that complaint was part of the governmental records which could be, and ultimately were, accessed by members of the press. These posts could be read by a reasonable person as racist, (*see, e.g.*, Doc. 24-10 at 26 ("We call it the Chinese virus because it comes from China"); *id.* at 29 (indicating in a comment that people needed to "get over it and move on" regarding slavery); *id.* at 36 (reposting a statement about "selling my white privilege card" and wanting to "trade" it "for a race card" because "those seem way more useful and

more widely accepted"), supporting police violence against citizens, (*see, e.g.*, *id.* at 27 (In reference to police officers responding to protests, stating: "KY backwoods boys gonna show show [sic] up!! They're gonna FAAFO!!!"); *id.* at 37 (picture of a disabled parking spot with he caption "BLM activists in Wisconsin paint street mural in support of Jacob Blake," who had been paralyzed after being shot in the back by law enforcement); *id.* at 42 ("Warning to BLM & Antifa Once you've managed to defund & eliminate the police, there's nobody protecting you from us. Remember that.")), promoting war and violent civil unrest in the United States, (Doc. 24-8 at 18 ("This is some bullshit [two cursing emojis]. Civil War is right around the corner. It's coming, prepare for it now"); Doc. 24-10 at 33 ("A 17 year old dropped 3 rioters what do you think 5 or 6 combat vets will do"); *id.* at 44 ("Be prepared!!! D.N.I is possibly tomorrow… Do your research  . . . troops are preparing and China has deployed troops to Canada. WW3 is coming!!!")); and supporting the January 6 Capitol attack, Doc. 24-8 at 26 (posting during the January 6 attack: "The silent majority will rise!! Day one of the Revolutionary War!! Hang on, it's only just begun" with the hashtag #fuckaroundandfindout); (Doc. 24-10 at 46 (indicating that the January 6 protestors had "a legitimate reason" for what they were doing)).[11]

---

[11] The Court makes no findings of fact as to what Plaintiff actually meant by his posts—such a finding is unnecessary here. What matters for this analysis is whether Defendant had a legitimate basis to believe that Plaintiff's posts could be read in such a way as to disrupt the efficient functioning of the police department.

The Eleventh Circuit has "recognized a heightened need for order, loyalty, and harmony in a quasi-military organization such as a police . . . department." *Moss*, 782 F.3d 621. Given the upheaval in the United States at the time, including the racial tensions and protestors storming the Capitol, along with the clear interest by the media in these issues, it was entirely reasonable that Defendant took action before Plaintiff's comments could cause disruption to the functioning of the police force, including causing the public to lose confidence in Defendant's ability to provide services. *See Snipes*, 704 F. App'x at 853 (explaining that the plaintiff's Facebook posts, which could reasonably be construed as racist and cause the public to wonder if a black person would get equal care by the defendant, implicated "precisely the type of public confidence which we have traditionally viewed as a compelling government interest"); *id.* (finding that it was "plainly obvious that [the plaintiff's] comments," which were made in the midst of similar racial tensions and protests surrounding the shooting of Trayvon Martin but which were not as numerous or as explicit as those made by Plaintiff here, "could be reasonably expected to cause a disruption in the efficient functioning of the County").

Accordingly, even assuming Plaintiff's posts were on matters of public concern, he has failed to satisfy the second prong—that his "First Amendment interest in engaging in the speech outweigh[ed]" Defendant's "interest in prohibiting the speech to promote the efficiency of the public services it performs through its

employees." *McAlpin*, 61 F.4th at 934. As such, Defendant is entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

    1.  Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED in part** and **DENIED in part**.

        a.  Defendant is entitled to the entry of judgment in its favor as to Counts I through IV.[12]

        b.  The Motion is otherwise **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on November 4, 2024.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[12] A single, final judgment will be entered at the conclusion of this case.